IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| Plaintiff, | ) | |
| vs. | ) | Civil Action No.7-692 |
| MAGAZINE SOLUTIONS, LLC *et al*, | ) | |
| Defendants. | ) | |

AMBROSE, Chief District Judge

**OPINION**

Plaintiff Federal Trade Commission ("FTC") enforces the FTC Act, 15 U.S.C. § 41 et seq., which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, which prohibits deceptive or abusive telemarketing acts or practices.[1] The FTC contends that the Defendants Magazine Solutions, LLC, United Publishers Service, Inc., Joseph Martinelli,[2] Barbara DeRiggi[3] and James Rushnock[4] have violated the FTC Act and the TSR in the course of telemarketing a magazine subscription and coupon certificate package.

---

[1] In 1994 Congress directed the FTC, pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act") to promulgate rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. Section 6101-6108. The FTC subsequently issued the TSR.

[2] According to the FTC, Martinelli owns both Magazine Solutions and United Publishers.

[3] The FTC contends that DeRiggi is the general manager of both Magazine Solutions and United Publishers.

[4] The FTC believes that Rushnock is or was a manager of Magazine Solutions and United Publishers.

In general terms, the Defendants are alleged to have engaged in a scheme between April 2002 and March 2007 wherein they placed a series of telemarketing calls to consumers to sell magazine subscriptions. During the first call, the Defendants only told the consumers that they would receive $1,000 in shopping coupons if the consumer "qualified" for the program based upon responses to questions. In the second and third calls, the Defendants are alleged to have disclosed that the consumers must first agree to purchase a magazine service in order to receive the coupons. The Defendants then sent consumers a Mail Order Agreement ("MOA") which they viewed as a non-signature agreement. The MOA contained a clause informing the consumer that he / she had 3 or 7 days to cancel or else would be charged for the magazines. The FTC contends that the coupons were not as promised, that the D efendants refused requests to cancel subscriptions, and that the Defendants threatened legal action against consumers who failed to comply with scheduled payments.

Accordingly, the FTC filed a seven count Complaint against the Defendants seeking preliminary and permanent injunctive relief. Specifically, the FTC contends that the Defendants falsely represented that the consumers will receive valuable coupons worth at least $1,000 in violation of § 5(a) of the FTC Act, 15 U.S.C. § 45(a) (Count I); that the Defendants falsely represented that the consumers are legally obligated to pay for the Defendants' services in violation of § 5(a) of the FTC Act, 15 U.S.C. § 45(a) (Count II); and that the Defendants falsely represented that they intended to initiate legal action to collect payment for their services when in fact they did not so intend, in violation of § 5(a) of the FTC Act, 15 U.S.C. § 45(a) (Count III). The FTC also contends that the Defendants failed to promptly disclose that the purpose of their call was to sell goods or services in violation of § 310.4(d)(2) of the TSR, 16 C.F.R. § 310.(4)(d)(2) (Count IV); that the Defendants failed to clearly and conspicuously disclose, before the customer pays, the total cost to purchase the goods or services offered, in violation of § 310.3(a)(1) of the TSR, 16 C.F.R. § 310.3(a)(1)(I) (Count V); that the Defendants made false or misleading statements to induce

persons to pay for goods and services in violation of § 310.3(a)(4) of the TSR, 16 C.F.R. §310.3(a)(4) (Count VI);[5] and that the Defendants misrepresented material aspects of the nature and terms of their cancellation policy in violation of § 310.3(a)(2)(iv) of the TSR, 16 C.F.R. § 310.3(a)(2)(iv) (Count VII).

On June 20, 2007 I held a preliminary injunction hearing in accordance with the FTC's request. At that hearing, the Defendant Companies represented that they were no longer selling magazines and agreed to the entry of an injunction with respect to making misrepresentations in that regard. See Transcript, p. 2. The issue before me thus concerned the FTC's request that the Defendant Companies be enjoined from collecting on existing accounts. After hearing testimony, reviewing documents and briefs submitted following the hearing, I subsequently enjoined United Publishers, Magazine Solutions and Martinelli from engaging in continued collection practices. See Docket No. [49].

The parties have completed discovery. Both the FTC and DeRiggi seek the entry of summary judgment. See Docket Nos. [101] and [105]. After careful consideration, and for the reasons set forth below, the FTC's Motion is granted in part and denied in part. Barbara DeRiggi's Motion is denied.

## Standard of Review

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material when it might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Rule 56 mandates the

---

[5] The misleading statements echo those complained of in Counts I, II and III - that the consumers will receive valuable coupons, that the consumers have entered into binding contracts, and that the Defendants will initiate legal action to collect the debt.

entry of judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In considering a motion for summary judgment, the Court must examine the facts in the light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the nonmoving party. Anderson, 477 U.S. at 248. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

## Analysis

I. The FTC's Motion

A. Violations of Section 5 of the FTC Act

Section 5 of the FTC Act declares unlawful "unfair or deceptive acts or practices in or affecting commerce... ." 15 U.S.C. § 45(a). The FTC describes as "deceptive" pursuant to Section 5, the Defendants' representations regarding: the coupons consumers would receive (Count I); the consumers' contractual obligations to pay for the magazine subscription service (Count II); and their intention to initiate legal action to collect payment for those services (Count III). To prevail on these claims, the FTC must demonstrate that: "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances; and

(3) the representation was material." FTC v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003), citing, FTC. v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir. 1988); FTC v. Atlanta Assoc., 1987-2 Trade Cas. (CCH) ¶ 67,788 at 59252, 1987 WL 20384 (S.D. Fla. 1987), aff'd, 872 F.2d 966 (11th Cir. 1989). See also FTC v. Verity Intern., Ltd., 443 F.3d 48, 62 (2d Cir. 2006). The representation can be express or implied. Thus, a defendant can be found liable for "misleading consumers both by innuendo as well as by outright false statements." In re Kraft, Inc., 114 F.T.C. 40,121 (1991), aff'd, 970 F.2d 311 (7th Cir. 1992). The deception need not be made with intent to deceive; it is enough that the representations or practices were likely to mislead consumers acting reasonably." FTC v. Verity, 443 F.3d at 63, citing, World Travel, 861 F.2d at 1029 and FTC v. Davison Associates, Inc., 431 F. Supp.2d 548 (W.D. Pa. 2006). As the Defendants concede, a claim is likely to mislead when it is false. See Docket Nos. [135], p. 7 and [137], p. 2. Further, the FTC need not prove actual consumer reliance or injury. See FTC v. Freecom Communications, 401 F.3d 1192, 1203 (10th Cir. 2005), citing, FTC v. Think Achievement Corp., 144 F. Supp.2d 933, 1010 (N.D. Ind. 2000), rev'd in part on other grounds, 312 F.3d 259 (7th Cir. 2002) (stating "[a]ctual deception of the consumers need not be proven; rather, the likelihood of deception or the capacity to deceive is the criterion by which the advertising is judged."). Finally, the representation must be material. "[A] material representation, omission, act or practice involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product." Matter of Cliffdale Associates, Inc., 103 FTC 110 (1984).

With this framework in place, I turn to consider the particular claims of deceptive acts.

1. Count I - Coupons

The FTC contends that the Defendants falsely represented that consumers would receive "valuable coupons worth at least $1,000." See Complaint, ¶ 32. The "Qualifying Script" produced

by the Defendants[6] represented that individuals who qualified for the program "will receive $1,000 in shopping coupons." See PX 10. The Advertising Script references "a book of certificates worth $1,000" which could be "used to order discount coupons." Id. The Script further informs that "each certificate is worth $10.00" and instructs the individual "whenever you want coupons, just pick out the products you want coupons for, mark them on one of the $10.00 certificates, mail it in and in several days, you receive only coupons that you requested." Id. The Closing Script also makes references to "$1,000 in coupon certificates... ." Id. Additionally, the MOA sent to consumers represented that the "total value of your Coupon Book is $1,800.00, provided all coupons are redeemed." PX 86, p. 59.

Though not entirely clear, it appears as though the FTC contends that these representations were false in two respects: (1) the representations suggest that the Defendants themselves provide the coupons when in fact the coupons come from a third party; and (2) the coupons were not "valuable." Genuine issues of material fact exist which preclude the entry of summary judgment with respect to both arguments.

Specifically, reasonable finders of fact could disagree as to whether the Defendants' representations about what they would send consumers were "likely to mislead." The Defendants referenced "certificates" which had to be mailed in to receive the coupons. Additionally, the diagram set forth on the MOA clearly indicated that the certificates had to be sent in to a redemption center in order to receive the coupons. Reasonable people could disagree as to whether these representations would have suggested to the consumer that the Defendants

[6] Defendant Martinelli testified that it was the business practice to make a total of three phone calls regarding the magazine subscription service. During the first call, the telemarketer read from the "Qualifying Script." According to Martinelli, the purpose of this call was to determine which potential customers were able to pay for (qualify for) the service and had an interest in reading. The "Advertising Script" was read during the second call. The Advertising Script first discloses the notion that the Defendants are selling a magazine subscription service. The "Closing Script" is read during the third and final phone call. See PX 10 and PX 86, p. 16-18.

themselves provided the actual coupons or whether the Defendants provided only the certificates and that a third party would provide the coupons.

Reasonable finders of fact could also disagree as to the value of the coupons.[7] Admittedly the FTC provides evidence that certain of the Defendants' customers received either no coupons, coupons which were expired, or coupons for products they did not use. See FTC Ex. 22, 24, 26, 31, 33, 40 and 94. The FTC also proffers evidence that the coupon company Defendants used at one point in time entered Chapter 7 liquidation bankruptcy and a period of time transpired before the Defendants secured a new coupon provider.

Yet other facts of record call into question whether consumers' failure to obtain coupons was the result of actual deception or something less nefarious. For instance, Rushnock testified that in his experience most problems associated with coupons resulted from using an incorrect address - which the Defendants attempted to correct. See PX 84, p. 38. The Defendants proffered evidence indicating that when the original coupon provider had a change of address, it informed the Defendants that it would handle contacting the consumers with regard to the same. See DX 3, ¶ 72. The Defendants also submitted evidence from one consumer who had no difficulty obtaining appropriate coupons or seeing the expiration dates for such coupons before making a selection. See DX 7 (Warner Declaration).

In short, while the record does contain evidence supporting the FTC's contentions, it also contains evidence supporting the Defendants' contentions that failures to obtain coupons were based upon something other than deception - such as incorrect addresses, the coupon provider's failure to take promised action, bankruptcy, or a consumer's simple failure to follow through on his

---

[7] To the extent that the FTC faults the Defendants for failing to identify a single customer who received coupons worth $1,000 or more, I note that the MOA references the worth of the coupon certificates if redeemed. I do not have before me any evidence that a consumer attempted to redeem all the coupons and that such redemption did not equal $1,000 in savings.

/ her obligations. I simply cannot find as a matter of law at this juncture that the Defendants' representations regarding the value of the coupons was deceptive.

Summary judgment is denied as to Count I.

2. Count II - Contractual Obligations

The FTC contends that the Defendants represented, both expressly and by implication, that consumers were legally obligated to pay for their services. The FTC proffered uncontradicted evidence that the Defendants sent form letters out on delinquent accounts to consumers who had asked to cancel their accounts. See PX 84, p. 130. The form letters included the following language:

> Please be advised that we cannot cancel your contract. Our records indicate that you have already authorized magazines to be sent to you and the above named gift recipient.

See PX 84, Ex. 3, bates no. 002609. The Defendants also sent a form letter when accounts became delinquent, referencing the "mail order contract for magazines purchased." See PX 84, Ex. 3, bates no. 002600. Defendants' employees also made phone calls to delinquent consumers. Px. 84, p. 92-108. Defendants' employees would tell consumers that they had the consumers' "electronic signature" and that there was a contract binding the consumer. See PX 86, p. 163-64.

According to the FTC, these representations were likely to mislead consumers because they were false. The FTC reasons that the representations were false because statutes in a variety of states rendered the "contracts" nonbinding or permitted the consumers to cancel them at any time. I agree that as a legal matter, the representations made both in the form letters and the comments set forth above made during collection calls would be likely to mislead for the reasons set forth below. I cannot make any findings, however, as to the particulars of the Defendants' numerous customers because I do not know which customers received letters, which received

phone calls, and where those customers lived. Consequently, I make only broad legal findings here.

I agree with the FTC that the written and verbal representations that the customers had binding legal contracts were likely to mislead those consumers who lived in Alabama, Ala. Code, § 8-19A-14(a)(1); Alaska, AK St § 45.63.020; Arkansas, Ark. Code Ann. § 4-95-106(a); Connecticut, Conn. Gen. Stat. Ann. § 42-2859a); Florida, Fla. Stat. 501.615(1)(a); Indiana, IC §24-4.7-4-4(c)(1); Kansas, KS ST § 50-672(a); Louisiana, L.S.A.R.S. § 45:831(A); Maryland, MD Code Commercial Law § 14-2203(a); Mississippi, Miss. Code Ann. § 77-3-607(2)(a); North Dakota, N.D. Cent. Code § 51-18-04; Ohio, Ohio Rev. Code § 4719.07(A); Oregon, Or. Rev. Stat. § 83.715(2); Pennsylvania, 73 P.S. § 2245(a)(7) and South Dakota, S.D. Code Laws § 37.30A-4.[8] These states have telephone solicitation statutes that provide that agreements such as the MOA used here must be reduced to writing and signed by the consumer in order to be binding and enforceable.[9]

I also agree with the FTC that the Defendants' representations that the consumers had binding, non-cancellable contracts were likely to mislead those consumers living in Michigan, Missouri, Vermont and Wyoming. These states have statutes which permit a consumer to cancel their contracts beyond the point in time represented by the Defendants. See Mich. Comp. Laws §

---

[8] The Defendants contend that the statutes in Alabama, Arkansas, Florida, Kansas and Louisiana actually place the onus upon the customer to void the contracts. I reject the Defendants' argument that these provisions allow them to avoid liability. Generally these statutes provide that consumers who have paid can void the contract if they follow particular procedures. See Ala. Code 58-19A-14(c); Ark. Code Ann. 4-95-106(b)(1); Fla. Stat. 501.615(5); KS ST 50-672(e) and L.S.A.R.S. 45:831(F)(1). The clear indication from the Defendants' letters and telephone calls is that any customers who tried to cancel were told cancellation was not possible. Accordingly, the Defendants cannot now seek the benefit of these provisions when they refused to honor attempts to void the contracts.

[9] I recognize that the Defendants contend that they have obtained "Certification Certificates" signed by a number of consumers. Though these Certification Certificates may impact the amount of the FTC's ultimate recovery, they do not alter my conclusion that, as a matter of law, the representations the Defendants made in the letters and phone calls violated the state solicitation statutes.

445.113(4) (providing that until a seller receives a signed written contract with a specific cancellation notice, the buyer may cancel by notifying the seller of his / her intention in any manner); Mo. Rev. Stat. § 407.710(3) (stating that a buyer may cancel a sale by any means until a seller presents a written agreement with the buyer's signature which contains a specific cancellation clause); Vt. Stat. Ann. Tit. 9 § 2454(a)(1) (providing that the consumer has 3 days within which to cancel after signing an agreement); and Wyo. Stat. Ann. § 40-14-252(a) (same).

I reach the same conclusion with respect to the likelihood of misleading those consumers living in North Carolina and West Virginia. In North Carolina, the Defendants previously entered into a consent judgment which required that they treat all non-written contracts as month to month contracts terminable at any time upon thirty days notice. See PX 88, ¶ 11. Additionally, as a result of a lawsuit in West Virginia, West Virginia residents have the right to cancel multiple magazine subscriptions at any time. See PX 87, p. 2. Accordingly, representations to these customers who tried to cancel their contracts that the contracts were nevertheless binding were likely to mislead.

Finally, the representations were likely to mislead those consumers living in states subject to the Uniform Commercial Code's Statute of Frauds. See Docket No. 102-2, Att. A for a citation list. These statutes provide that agreements which cannot be completed within one year and cost over $500 are unenforceable unless they are signed by the party against whom enforcement is sought. Again, with the exception of the allegation regarding those customers who signed "Certification Certificates," the Defendants have not identified any signed agreements, the agreements actually in place exceeded $500 in costs and could not be completed within one year. Nevertheless, the Defendants told those customers who sought to cancel that they had binding contracts and were obligated to pay.

The Defendants raise as a defense the partial performance exception to the Statute of Frauds. This exception contemplates the validation of an otherwise unenforceable agreement when goods have been accepted and payment has been made. See UCC § 2-201(3)(c) (finding

that contracts are enforceable "with respect to goods for which payment has been made and accepted or which has been received and accepted."). The FTC appears to concede that this defense may "apply to consumers who did not attempt to cancel before the first magazines arrived." See Docket No. 102, p. 17-18. Accordingly, I will not grant summary judgment in the FTC's favor as to these consumers - the precise number of whom must be worked out. I do, however, agree with the FTC that the partial performance exception is inapplicable with respect to those customers who attempted to cancel before their first magazine arrived. The particulars of how many customers or who those customers may have been are not before me and will have to be sorted out at a later date.[10]

3. Count III - Initiation of Legal Action

The FTC contends that the Defendants represented to consumers that they intended to and would initiate legal action if the consumers did not pay. The record contains evidence that the Defendants did, in fact, make express written representations regarding their intention to take legal action. See PX 85, Ex. 8, p. 2, 5 (stating that "You are hereby notified your account is 90 days delinquent and due in full. A local attorney will be contacted unless you reply within 72 hours by calling ... ."); PX 93, Att. B (stating "Unless payment is received, your account will be forwarded to a collection attorney in your area."); PX 84, Ex. 3 bates no. 002620 (containing language that "You have now forced us to locate a collection attorney in your area. We will instruct the attorney to take appropriate action. This usually requires the attorney to file a claim for the entire balance of your contract ... $777.00 plus all late charges and penalties, filing costs and legal fees.") and PX 84, Ex. 3, bates no. 002621 and 002617 (enclosing a letter to the Defendants' attorney stating that the consumer has failed to honor his / her contractual obligations and requesting "within seven (7) days

---

[10] The Defendants do not dispute the FTC's allegation that the Defendants' representations regarding the obligation to pay were material. Indeed, the record does contain evidence that the Defendants' representations induced customers to continue making monthly payments and / or to pay early termination fees. See PX 84, p. 115-117.

of receipt of this letter, you contact a local collection attorney in the consumer resident area to file our claim with the appropriate agencies. Please have that attorney file for total balance due plus all costs, late fees and applicable interest allowed by local state law. Also advise our company if wage garnishment is available in their state."). The record also contains evidence that these types of letters are form letters which the Defendants use with respect to delinquent accounts. See PX 83, p. 94 (testimony by Martinelli at the preliminary injunction hearing that "we have a series of form letters that go out, goes from an invoice all the way up to letters to get - you know, a little more forceful in request for payment.")

The record contains evidence that these representations were likely to mislead the consumers because they were false. The Defendants never initiated legal action. Martinelli himself testified that they represent that they intend to initiate legal action but do not actually do so:

> Q: Now, one of the allegations is that you said you intend to initiate legal action, but you don't. We can agree you do that. We can agree that you do do that.
> A: Yes, we do that, yes.

See PX 83, p. 99. indeed, the Defendants conceded that they have never taken any legal action against a consumer for failure to pay. See PX 8, no. 24 (question) and PX 11, no. 24 (answer).

Because the representations are express, they are presumed to be material. See In re Nat'l Credit Mgmt. Corp., LLC, 21 F. Supp. 424, 441 (D. N.J. 1998). Further, the record contains evidence indicating that consumers paid the Defendants in response to such representations. See PX 85, p. 149-50, 159-61, 164.

The Defendants do not dispute any of these facts. See Docket No. [137]. Instead, the Defendants contend that they acted in good faith. Yet because intent to deceive is not an element of a Section 5 claim, good faith is not a viable defense. See Regina Corp. V. FTC, 322 F.2d 765, 768 (3d Cir. 1963) and FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1028 (7th Cir. 1988). The Defendants also urge that they were entitled to rely on legal action with respect to

those consumers whose contracts did not violate one of the statutes identified above. (See discussion set forth in section 2 above). Yet as I have already held, this defense is rather meaningless because the Defendants have not identified any consumers (other than some unidentifiable number who signed "Certification Certificates") whose contracts did not violate one of the statutes identified above. Accordingly, the FTC is entitled to summary judgment with respect to the claim in Count III that the Defendants misrepresented that they intend to initiate and will initiate legal action to collect payment for their services.

B. Violations of the TSR

The TSR, promulgated pursuant to the Telemarketing Act, also targets abusive and deceptive acts or practices. 15 U.S.C. § 6101-6108. The Defendants do not dispute that as "sellers" or "telemarketers" engaged in "telemarketing" they are subject to the provisions of the TSR. See 16 C.F.R. § 310.2(z)(bb)(cc). What the parties do dispute, however, is whether the FTC is entitled to the entry of summary judgment on its claims that the Defendants violated the TSR. The FTC contends that the Defendants violated the TSR by failing to truthfully and promptly disclose the purpose of their call (Count IV); by failing to clearly and conspicuously disclose the total cost to purchase the goods offered (Count V); by making misrepresentations designed to induce payment (Count VI) and by making misrepresentations concerning the cancellation policy (Count VII).

1. Count IV - Disclosing the Purpose of the Call

The regulations declare it an "abusive telemarketing act" for a telemarketer "to fail to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call," the seller's identity; that the purpose of the call is to sell goods or services; and the nature of the goods and services. See 16 C.F.R. § 310(d)((1)-(3). As stated above, the Defendants made a series of three telephone calls to consumers. The first call, memorialized by the Defendants in the "Qualification Script," specifically negates the intent of selling anything. See PX10 bates no.

000006. Rather, consumers are simply informed that they are being invited to participate in a program which could qualify them for $1,000 in shopping coupons. Id. No mention is made that the purpose of the call is to sell magazines. The parties do not dispute these essential facts.

Instead, the Defendants reason that because no goods or services are being sold during this call, no disclosures are required. See Docket No. [137], p. 23-24. The Defendants maintain that the appropriate disclosures were made during the second call - which is memorialized in what the Defendants refer to as the "Advertising Script." See PX 10, bates no. 000007.[11] Accordingly, the issue before me is whether the Defendants had to disclose during the "Qualification Script" call that their intent was to sell magazines. In essence - was disclosure during the second call rather than the first call "prompt."

I find, as a matter of law, that the Defendants' disclosure was neither prompt nor clear within the meaning of 16 C.F.R. § 310.4(d)(2). My finding is predicated, in part, upon the FTC's "Statement of basis and purpose and final rule." See 60 F.R. ¶43842, 1995 WL 49773. In that Statement, the Commission recognized that the usual definition of the word "prompt" should apply - that is, "done, performed, delivered, etc., at once or without delay." Id., quoting, Webster's Encyclopedic Dictionary of the English Language at 1151 (Portland House 1989). While the Commission was unwilling to find that "prompt" required disclosure at the beginning of the telephone call, it did agree that "[a]t a minimum ... 'prompt' disclosure should be made prior to the time any substantive information about a prize, product, or service is conveyed to the consumer." 60 ¶ 43856 n. 149.

Here, it is clear from the text of the Qualifying Script that the Defendants give substantive information to the consumer about the "prize, product or service" before disclosing that the Defendants intended to sell magazines. During the first call, the Defendants reference the

[11] The FTC does not take issue with the notion that the appropriate disclosures are made in the Advertising Script.

consumers' receipt of $1,000 in shopping coupons; that the coupons are good "from A to Z"; and that the consumer will get to select only the coupons he/ she wants for the products he / she uses. See PX 10, bates no. 000006. At no time before this substantive information about the coupons is given do the Defendants disclose that they are selling magazines. Indeed, the telemarketer assures the consumer "Now don't get worried... I'm not selling anything today... ." Id. Accordingly, the Defendants' disclosure was not prompt and clear. The FTC is entitled to summary judgment on this issue.

2. Count V - Disclosure of Total Costs

The TSR declares it a deceptive telemarketing act or practice for a telemarketer to fail to disclose truthfully, in a clear and conspicuous manner, "the total costs to purchase, receive, or use, and the quantity of any goods or services that are the subject of the sales offer," before a customer pays. 16 C.F.R. § 310.3(a)(1)(I). In its Statement,[12] the Commission explained "payment" as follows:

> The Commission intends that the disclosures be made before the consumer sends funds to a seller or telemarketer or divulges to a telemarketer or seller credit card or bank account information.

See 60 C.F.R. ¶ 43842, ¶ 43846. According to the Commission, disclosure must also occur "before requesting any credit card, bank account, or other information that a seller or telemarketer will or could use for payment." 68 F.R. 4580, 4599.

The FTC contends that the Defendants' disclosures were neither clear nor conspicuous. Rather, the FTC urges, the disclosures were confusing and inconsistent. I agree.

In the Advertising Script, the Defendants first explain that the magazines would be available "for just $2.99 each week payable monthly for the next 60 months... ." See PX 10, bates no.

---

[12] An agency's interpretation of its own regulations is entitled to deference. See FTC v. Med. Billers Network, Inc., 2008 U.S. Dist. LEXIS 2643, 88-89, 93 (S.D. N.Y. March 31, 2008).

000007. The Script goes on to say that "for your convenience ... the weekly...is payably monthly not every week." Id. During the third and final phone call, memorialized in the Closing Script, the telemarketer again references "$2.99 each week payable monthly for the next 60 months." Id., bates no. 000008. The telemarketer then states:

> Now as we said before, the program averages out to just $2.99 per week. It works like your Newspaper Service except that it is payable monthly... and that averages out to only $12.95 a month. Now because there are some months that have four weeks and some months that have five... this in the past has caused confusion. Therefore to make it easier for our customers we ask that you mail 2 months at a time or just $25.90 with the understanding that you only mail the $25.90 for the first 30 months of service and nothing the remaining 30 months, but you still receive your magazines.

Id.

At that point in time the telemarketer explains that the coupon book cannot be mailed until the first month payment of $12.95 is made. Id. The Defendants then ask for credit card, debit card and / or auto-checking information. Id., bates no. 000008.

Thus, the Defendants reference both "$2.99 payable weekly" and "$25.90 payable monthly." They reference payment installments occurring over 60 months and payment installments occurring over 30 months. All of these statements are made over the phone without benefit to the consumer of any written materials to review. There can be no doubt that these statements are neither clear nor conspicuous.

The Defendants insist that because they disclose the total sum of the contract, their disclosure is in fact clear and conspicuous. I disagree. The disclosure regarding the full cost of the magazine subscription does not occur until after the Defendants have solicited information regarding payment. Further, though the Commission does allow for disclosure to be made in terms of installment payments, these disclosures have to be accurate:

> As noted in the TSR Compliance Guide, "[i]t is sufficient to disclose the total number of installment payments, and the amount of each payment, to satisfy this requirement. Some commentators in the Rule Review urged the Commission to

> require, in sales involving monthly installment payments, the disclosure of the total cost of the entire contract, not just the amount of the periodic installment. In the NPRM, the Commission declined to modify the provision, but clarified that "the disclosure of the number of installment payments and the amount of each must correlate to the billing schedule that will actually be implemented. Therefore, to comply with the Rule's total cost disclosure provision, it would be inadequate to state the cost per week if the installments are to be paid monthly or quarterly.

See 68 FR 4580-01.

As is disclosed in the "Closing Script" after information regarding payment is solicited, the Defendants actually bill $25.90 for 29 successive months, then issue one final bill for $12.95. See PX 10, bates no. 000008. This is inconsistent with the representations made that the consumer will be billed for 30 payments of $25.90. The fact that the Defendants may subsequently clarify the actual manner of the installment payments together with the total cost of the subscription (see PX 10 bates no. 000009) is irrelevant because such disclosures come after payment and account information is requested.

In summary, the Defendants reference weekly payments, monthly payments, installment payments occurring over 30 months and installment payments occurring over 60 months. These confusing and inconsistent statements are all made before the Defendants ask for payment information. It is only after such information is requested that the total cost of the purchase is accurately revealed. According, the FTC is entitled to summary judgment on this issue.

3. Count VI - Statements Made To Induce Payments

The FTC's arguments regarding the making of false statements intended to induce consumers to pay for goods and services essentially repeat earlier arguments made under § 5 of the FTC Act. That is, the FTC insists that the Defendants made false statements regarding coupons, false statements regarding legal obligations to pay for the magazine service and false statements regarding their intent to initiate legal action. Both parties incorporate their arguments set forth with respect to the assertions made under § 5 of the FTC Act. Consequently, because

no new contentions have been made, I reach the same conclusions I previously reached. That is, summary judgment is denied with respect to the FTC's claim regarding the coupons and granted with respect to the claim regarding the legal obligations to pay and the intent to initiate legal action, as more fully set forth above.

4. Count VII - Cancellation Policy

The TSR declares it a deceptive act to misrepresent "[a]ny material aspect of the nature or terms of the seller's refund, cancellation, exchange or repurchase policies." See 16 C.F.R. § 310.3(a)(2)(iv). The FTC urges that the Defendants misrepresent their cancellation policy in various ways. Specifically, the FTC contends that a representation made during one of the telephone calls is at odds with what is contained in the MOA.[13] The FTC also contends that the policy set forth in the MOA differed from the policy the Defendants actually followed.[14]

Genuine issues of material fact prevent the entry of summary judgment. There is no doubt that the Defendants misrepresented their cancellation policy. However, to constitute a violation of the TSR that misrepresentation must be "material." Giving customers a more generous time frame within which to cancel and / or explaining verbally that cancellation is permitted if a telemarketer provided false information when the MOA does not predicate cancellation upon such falsity may not be "material" misrepresentations. The record contains evidence that a substantial number of the Defendants' customers cancelled their agreements in accordance with the terms of the MOA between the years 2002 and the present. See PX 86 at 61:18-62:6 (testimony from Martinellli that

---

[13] In the "Closing Script" call, the telemarketer is to inform the consumer that "if everything I have told you is not true, you have the right to cancel 72 hours, after you receive your written agreement and guarantee." See PX 10 bates no. 000009. The MOA, however, provides that a consumer wishing to cancel must complete an enclosed form and return it within 3 or 7 days - depending upon the consumer's state of residence. See PX 11. The form recommends that consumers send the notice certified mail. Id.

[14] The Defendants testified that it was their policy to typically give consumers 7-10 days to cancel, or until they placed an order for magazines. See Docket No. 30, p. 11, paragraph 2; PX 85 at 75:3-6.

between 65% and 75% of the customers ultimately cancelled); DX3, ¶ 56; DX4, ¶ 23 (stating that between 2002 and the present 7,220 out of 18,616 customers cancelled within the appropriate time frame or before a magazine order was placed). The fact that so many customers were able to understand and follow the Defendants' cancellation policy set forth in the MOA suggests that the misrepresentations made during the phone calls were not, perhaps, "material." The FTC has not directed me to any case law granting summary judgment in similar circumstances. Because I believe that reasonable fact finders could disagree, summary judgment is denied.

C. . Corporate Liability

The FTC urges that "[w]here one or more corporate entities operate in a common enterprise, each may be held liable for the deceptive acts and practices of the others." See Docket No. 102, p. 20, quoting, FTC v. Think Achievement Corp., 144 F. Supp.2d 993, 1011 (N.D. Ind. 2000). According to the FTC, because Magazine Solutions and United Publishers are both owned by Martinelli, are run by the same people, share the same office space and employees, do business under each other's names, share the same customer base and share bank accounts and funds, there can be no genuine issue of material fact that they are a common enterprise. Significantly, Magazine Solutions and United Publishers do not dispute this assertion and the facts of record support the FTC's argument. Consequently, the FTC is entitled to summary judgment on the issue of Magazine Solutions' and United Publishers' liability as a common enterprise.

D. Individual Liability

The FTC also seeks to hold Martinelli, Rushnock and DeRiggi liable as individuals for the Corporate Defendants' actions. Upon establishing corporate liability, an individual may be held liable under the FTC Act if the FTC can demonstrate that "'the individual defendants participated directly in the practices or acts or had authority to control them." Federal Trade Commission v. Chinery, Civ. No. 5-3460, 2007 WL 1959270 at * 6 (D. N.J. July 5, 2007), quoting, FTC v. Amy Travel Service, Inc., 875 F.2d 564, 573 (7th Cir. 1979). "'Authority to control the company can be

evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer.'" Id. (quotations omitted). "The FTC must also "prove that the individual defendants either knew or should have known about the deceptive practices, but is not required to prove subjective intent to defraud." FTC v. World Media Brokers, 415 F.3d 758, 764 (7th Cir. 2005), citing, Amy Travel, 875 F.2d at 573-74. The knowledge requirement may be satisfied by showing that the individual had "'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud with an intentional avoidance of the truth.'" Id., quoting, Amy Travel, 875 F.2d at 574.

Here, I have determined that the FTC has established corporate liability only as to Counts II, III, IV, V, and portions of VI. Accordingly, I will assess individual liability only as to those Counts.

1. Martinelli

The FTC contends that as owner and sole officer of United Publisher and the only member of Magazine Solutions, and as the individual who formulated, directed, controlled and / or had the authority to control their acts and practices, Martinelli should be held personally liable for any and all injuries caused by the Corporate Defendants. Again, significantly, Martinelli does not dispute his individual liability for the injuries caused by United Publishers and / or Magazine Solutions. Consequently, the FTC is entitled to summary judgment on the issue of Martinelli's personal liability for injuries caused by the Corporate Defendants.

2. James Rushnock

After careful consideration, I find that the FTC is not entitled to summary judgment with regard to Rushnock's individual liability regarding Count IV (failure to disclose the purpose of calls), Count V (failure to disclose the total costs) and that portion of Count VI addressing coupons. Simply stated, the FTC has not demonstrated that Rushnock participated directly in, had authority or control over, or had actual knowledge regarding United Publishers' and / or Magazine Solutions'

alleged deceptive practices relating to marketing. The facts of record indicate that Martinelli and perhaps DeRiggi (as set forth below), not Rushnock, developed the Scripts which the telemarketers used. Those Scripts contained the representations regarding coupons and the costs of goods. Further, it was by following those Scripts that the telemarketers failed to disclose the purpose of their calls. The FTC simply has not demonstrated at this juncture that Rushnock had the type of involvement in the marketing end of the Corporate Defendants' business which would expose him to individual liability.

I reach a different conclusion, however, with respect to Count II (misrepresentation of legal obligation to pay for services), Count III (misrepresentation of intent to initiate legal action), and the corresponding portions of Count VI (misrepresentations regarding legal obligation to pay for services and intent to initiate legal action).[15] The uncontradicted evidence of record indicates that Rushnock had knowledge that the MOA the Defendants were using was not legally enforceable. Indeed, in March of 2003, the Defendants' attorney sent a fax addressed to Rushnock a memo stating "[b]asically, as far as legally enforcing this agreement [the MOA] it is impossible. The Courts will not recognize the taped verification as evidence of a contract because of the statute." See PX 84 at 261:20 - 265:19 and Rushnock Ex. 11. Despite this knowledge, as manager of the customer service / credit department Rushnock participated directly in issuing letters to consumers indicating that those consumers had legally enforceable contracts and in confirming the same to consumers with whom he spoke on the telephone. See PX 84 at 130:1 - 131:16 and 134:1-14 (Rushnock testifying that he spoke with consumers and explained that the Defendants had taped authorizations and thus enforceable contracts, and that he sent letters regarding the same). Rushnock's direct participation in informing customers that they had legally binding contracts and

[15] I note that in Defendant Barbara DeRiggi and James Rushnock's Memorandum in Opposition to Summary Judgment (Docket No. [135]), Rushnock does not defend the FTC's Motion on the grounds that he did not have personal involvement or the requisite level of knowledge with respect to Counts II, III and the corresponding portions of Count VI.

his knowledge that such representations were deceptive constitute grounds for personal liability under Count II and the relevant portion of Count VI.[16]

Further, as to the intent to initiate legal action, the record again contains uncontradicted evidence that Rushnock knew both that the Defendants did not intend to initiate legal action against delinquent account holders and that the Defendants in fact had never initiated such legal action. See PX 84, p. 143-146. Additionally, the evidence indicates that Rushnock himself was personally involved. He signed some of the letters that went to consumers informing them of the intent to take legal action. See PX84, p. 142-144. Rushnock's direct participation in informing customers that the Defendants would initiate legal action and his knowledge that such representations were deceptive constitute grounds for personal liability under Count III and the relevant portion of Count VI.

3. Barbara DeRiggi

Both the FTC and Barbara DeRiggi seek the entry of summary judgment in their respective favors. The FTC urges that when all of the material undisputed facts are considered, the record is clear that DeRiggi is individually liable for her participation in the Corporate Defendants' deceptive conduct. DeRiggi offers the opposite viewpoint.

Material facts are in dispute at this juncture. As stated above, liability can be imposed where an individual either participates in or has authority or control over actions. DeRiggi testified that she is not an owner or officer of the Corporate Defendants. Yet evidence of record also indicates that DeRiggi may have personally made shareholder loans to Defendant United

[16] Rushnock represents in his Response to Plaintiff's Statement of Undisputed Material Facts that although he read the attorney's memo regarding the Statute of Fraud, he "obtained a good faith belief that the Defendant Companies were legally permitted to pursue and file legal action against customers who did not pay for their services on a detrimental reliance and/or quantum meruit theory." See Docket No. 136, paragraph 198. I find Rushnock's contention misplaced. The representation made to consumers is that the MOA is legally enforceable, not that the Corporate Defendants may be able to recover costs under a different legal theory.

Publishers' Service, Inc. from a personal bank account she shares with Martinelli. See PX 99 (photocopies of checks signed by DeRiggi in the varying amounts with memo lines reading "loan from shareholder").[17] As an "owner" of United Publishers, DeRiggi arguably had the authority to control the entity and / or knowledge of the deception.

Evidence of record also indicates that DeRiggi was identified as the General Manager of Defendant Magazine Solutions, LLC, and is considered by others at the company to hold that position. See PX 7, PX 7B, PX 7C, PX 85 at 191:181-193:24; PX 101 and PX 84 at 25:8-18. Additionally, DeRiggi functions as the Controller of United Publishers and Magazine Solutions. See PX 85 at 13:7-14:5. DeRiggi contends her duties consist only of completing payroll, paying bills, bookkeeping, typing, getting the mail, managing the clerical workers and placing orders with the magazine clearinghouse. See Docket No. [106], p. 4. Yet the FTC provided evidence that DeRiggi's duties also included entering into "termination" agreements with consumers on behalf of the Corporate Defendants; speaking to consumers about canceling; reporting negative information about consumers to credit bureaus; responding to credit bureau requests for validation of the "debts"; and handling the finances of the Corporate Defendants, including billing consumers, depositing their payments, and arranging for money to be taken from their bank accounts. See PX 85 at 139:18-19; DeRiggi Ex. 10, p. 1-4; PX 98, Attachment B, p. 4; PX 37, ¶ 9 and Attachment B; PX 63 ¶ 4 and Attachment A, p. 2; PX 74 and PX 75 at no. 4; PX 85 at 164:1-4, 173:1-174:8; PX 86 at 197:6-25; PX 57; PX 58; PX 85 at 70:3-6, 153:23-254:5, 154:18-156:18, 181:9-12, 183:22-185:25. I agree with the FTC that these duties are not merely "administrative" in nature. Again, reasonable finders of fact could conclude that someone functioning as a "General Manager" and handling the duties described above participated in, had the authority to control, and had knowledge of the Corporate Defendants' deceptive actions.

---

[17] Of course DeRiggi denies that these are personal loans.

Genuine issues of material fact also exist with respect to DeRiggi's involvement with the telemarketing aspect of the Corporate Defendants' business. DeRiggi contends that she had no involvement in the creation of the three scripts used by the telemarketers. Yet the March 2006 CID issued to the Defendants by the FTC asked the Defendants to:

> Identify each and every person who wrote the documents produced in response to Document Request 11. (the telemarketing scripts) [and]
>
> Identify each and every person who reviewed the documents produced in response to Document Request 11.

See PX 11. The Defendants' response was "Joseph Martinelli and Barbara DeRiggi." Id.

The FTC has also proffered an organizational chart the Defendants prepared which indicates that the Credit Manager and the Supervisor of telemarketing employees reported to DeRiggi. See PX 11, bates no. 000018. DeRiggi admitted that she was aware of consumer complaints (such as that consumers were not receiving coupons) and that complaints came to the clerical department which she managed. See PX 85 at 57:17-58:19; 86:8-88:8; 89:14-22; 93:21-24; see also PX 84 at 159:2-24; 198:20-199:6. As Manager of Credit and Supervisor of Telemarketing, as well as an author of the telemarketing scripts, reasonable finders of fact could conclude that DeRiggi knew or should have known, and had control or authority over, deceptions occurring within the context of the telephone calls and deceptions occurring in the collections practice.

Given these disputed material facts, I find that neither party is entitled to the entry of summary judgment. Reasonable finders of fact could determine that DeRiggi did not know, and should not have known, of the Corporate Defendants' deceptive acts. On the contrary, however, they could similarly find that DeRiggi did know, should have known, and in fact participated in those deceptive acts. Consequently, both DeRiggi's and the FTC's Motion for Summary Judgment are denied.

2. Barbara DeRiggi's Motion

As stated above, I find that genuine issues of material fact exist which preclude the entry of summary judgment on Barbara DeRiggi's individual Motion for Summary Judgment. Reasonable jurors could reach opposing decisions regarding her personal liability for the Corporate Defendants' deceptive (and alleged deceptive) acts. Consequently, the Motion is denied.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No.7-692 |
| | ) | |
| MAGAZINE SOLUTIONS, LLC *et al*, | ) | |
| | ) | |
| Defendants. | ) | |

AMBROSE, Chief District Judge

**ORDER OF COURT**

After careful consideration and for the reasons set forth in the accompanying Opinion, the FTC's Motion for Summary Judgment (Docket No. [101]) is granted in part and denied in part. The FTC is entitled to the entry of summary judgment in its favor with respect to the claims asserted in Counts II (misrepresenting that consumers are legally obligated to pay); III (misrepresenting that they intend to initiate legal action); IV (failing to disclose the purpose of the call); V (failing to disclose the total cost of the call) and VI (granted as to the misrepresentations regarding legal obligation to pay and misrepresentations regarding intention to take legal action). Summary judgment is denied as to Count I (misrepresentations regarding the coupons); Count VI (denied as to that portion relating to coupons) and Count VII (misrepresentations relating to the cancellation policy).

The FTC is also entitled to summary judgment on the issue of the Corporate Defendants' joint liability and Martinelli as to individual liability. The FTC's Motion is granted with respect to Rushnock's individual liability in terms of Counts II, III and VI (legal obligation and threatening legal action), but denied as to all remaining Counts. The FTC's Motion is denied as to Barbara De Riggi.

Barbara De Riggi's Motion for Summary Judgment is also denied.

The FTC requests permanent injunctive relief as a component of its Motion for Summary Judgment. Because the case is not yet fully resolved, I will postpone entering an Order of permanent injunctive relief. I will, however, note that much of what the FTC requests is currently in place in terms of the Order granting preliminary injunctive relief, which is hereby continued. Thus, the Defendants continue to be enjoined from violating the FTC Act and TSR ( such violations would consist of representing that clients who have not signed a contract are legally obligated to pay, or threatening to take legal action; failing to promptly disclose the purpose of the call or to clearly and conspicuously disclose the cost of the program). Similarly, the Defendants continue to be enjoined from engaging in any collection activity unless a signed contract is in place. In that same vein, the Defendants are prohibited from placing any negative information on consumers' credit reports with respect to any consumer whom they have not obtained a signed contract.

Because the FTC has not succeeded on all claims, and because I am without much information regarding the number of consumers injured here, or the number of consumers who may have signed contracts with the Defendants, I decline to enter any award of monetary relief at this procedural juncture.

BY THE COURT:

/s/Donetta W. Ambrose
Donetta W. Ambrose,
Chief U.S. District Judge