IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FEDERAL TRADE COMMISSION,      )
                               )
        Plaintiff,             )
                               )
vs.                            )        Civil Action No. 7 -692
                               )
MAGAZINE SOLUTIONS, LLC, *et al.*  )
                               )
        Defendants.            )

AMBROSE, Chief District Judge

## FINDINGS OF FACT, CONCLUSIONS OF LAW and ORDER OF COURT

### FINDINGS OF FACT

*A. Procedural History*

1.      Plaintiff Federal Trade Commission ("FTC") is an independent agency of the United States Government created by the FTC Act, 15 U.S.C. sections 41-58. The FTC enforces the FTC Act, which prohibits unfair or deceptive acts or practices in or affecting commerce.

2.      The FTC also enforces the Telemarketing Sales Rule ("TSR"), 16 CFR part 310, which prohibits deceptive or abusive telemarketing acts or practices.

3.      The FTC is empowered to initiate proceedings through its own attorneys to enjoin violations of the FTC Act and the TSR, and to secure such equitable relief, including recision of contracts and restitution, and disgorgement of ill-gotten gains, as may be appropriate in each case. See 15 U.S.C. sections 53(b), 57B and 6105(b).

4.    The FTC initiated this action against Defendants Magazine Solutions LLC, United Publishers Service, Inc., Joseph Martinelli, Barbara DeRiggi and James Rushnock, for violations of the FTC Act and the TSR.

5.    Defendant Magazine Solutions is a Pennsylvania limited liability company.  It was formed in 1992.

6.    Defendant United Publishers was incorporated in Pennsylvania in 1980.

7.    Defendant Martinelli is the sole shareholder of United Publishers, which in turn owns Magazine Solutions.

8.    Defendant Barbara DeRiggi served as the controller for both United Publishers and Magazine Solutions.

9.    Defendant James Rushnock was employed by United Publishers first as a customer service representative and later as a credit manager / customer service manager.

10.   According to the FTC, since at least April of 2002, these Defendants have telemarketed a package consisting typically of five magazine subscriptions and a coupon certificate booklet.  The package is sold through a series of three unsolicited calls.  The Defendants target new mothers or families with young children.

11.   The FTC filed a seven count Complaint against the Defendants seeking preliminary and permanent injunctive relief. See Docket No. [1].

12.   The FTC charged the Defendants with having violated section 5(a) of the FTC Act by falsely representing that consumers would receive valuable coupons

worth at least $1,000 (Count I); by falsely representing that consumers were legally obligated to pay for the services (Count II); and by falsely representing that the Defendants intended to initiate legal action to collect payment for their services (Count III).

13.    The FTC also charged the Defendants with having violated various provisions of the TSR - by failing to promptly disclose that the purpose of their call was to sell goods (Count IV); by failing to clearly and conspicuously disclose, before the consumers paid, the total cost to purchase the goods / services offered (Count V); by making false / misleading statements to induce the customers to pay (Count VI); and by misrepresenting material aspects of the cancellation policy (Count VIII).

14.    This Court has granted summary judgment in favor of the FTC with respect to Counts II, III, IV and V and portions of Count VI (the misrepresentations regarding the legal obligation to pay and the misrepresentations regarding the intention to take legal action).  Summary judgment was denied as to Counts I and VII and a portion of Count VI (misrepresentation regarding the value of the coupons).

15.    The Court has also found that the Corporate Defendants acted as a common enterprise and are jointly liable for any violations and that Joseph Martinelli is individually liable for any actions engaged in by the Corporate Defendants.

16.    Though the Court denied at the summary judgment stage the FTC's request to find DeRiggi individually liable for the Corporate Defendants' actions, it did

find Rushnock individually liable for the Corporate Defendants' actions as set forth in Counts II and III and portions of Count VI (misrepresentations regarding the legal obligation to pay).

17.    A non-jury trial took place on the remaining liability issues: the Defendants' alleged false representations regarding the value of the coupons in violation of the FTC Act and the TSR (Counts I and VI); the Defendants' alleged misrepresentations of material aspects of the nature and terms of the cancellation policy in violation of the TSR (Count VII);  Barbara DeRiggi's individual liability; and the extent of the violations; as well as the issue of relief.

18.    These findings of fact are based upon the evidence presented at trial.

*B. False Representations Regarding the Value of the Coupons (Counts I and VI)*

19.    The FTC contends that the Defendants' representations regarding the coupons were false in two respects: (1) the Defendants falsely indicated that <u>they</u> would be providing the coupons; and (2) the Defendants misrepresented the value of the coupons the consumers would receive.

20.    As set forth below, I reject the FTC's first contention, but accept the second.

21.    The Defendants did explicitly represent to consumers that they will receive coupons worth over $1,000 and consumers subscribe to the Defendants' magazine program in order to obtain the coupons - which are represented to yield more money than the cost of the magazines.

22.    Those false representations begin with a series of three unsolicited phone

calls placed to consumers.   The telemarketers placing the calls follow particular scripts - the "Qualification Script", the "Advertising Script" and the "Closing Script."

23.   As the scripts reveal, the Defendants are not selling a magazine program, but a coupon program that will pay for some magazine subscriptions as a side benefit.

24.   For instance, during the first phone call, the telemarketers reading from the Qualification Script make the following representations:

   a.   Now if you qualify ... for this program ... you will receive $1000 ... in shopping coupons ... these coupons are good ... from A to Z ... You also get to select ... only the coupons you want ... for products you use!

   b.   Now all you need to do ... is answer a few questions ... about your shopping habits ...

   c.   You are probably wondering what the catch is ... right! Well..., first you will be happy to know ... there isn't any...!

   d.   We will call you in several days and let you know ... if you are eligible ... to receive the $1,000 in shopping coupons.

   PX86.

25.   The telemarketers then make a second call to consumers and read from the Advertising Script.  The telemarketers inform the consumers that:

   a.   Those people participating today, also will receive a book of certificates worth $1,000.  These certificates can be used to order discount coupons...[1]

---

[1] Here, the Defendants disclose that they provide consumers with a book of certificates with which the consumers can order the coupons.  My rejection of the FTC's contentions regarding the misrepresentations concerning the actual supplying of the coupons is based, in part,

b.    Now let me explain about your $1,000 in certificates you will receive for participating.  In the back of your registered book are your certificates for coupons, and each certificate is worth $10.00.  All you do is, whenever you want coupons, just pick out the products you want coupons for, mark them on one of the $10.00 certificates, mail it in and [in] several days, you receive only coupons that you requested.[2]

PX 86.

26.    Finally, the telemarketers place the third and final call, reading from the Closing Script.  The telemarketer opens by again referencing the "$1,000 in valuable coupons":

a.    We will promise to validate your $1,000 grocery coupon book.  These coupons as I said are good for everything from A to Z.  You can use these coupons EVERYWHERE you shop, as often as you like.

PX 86.

27.    After inquiring about the consumer's credit card, the telemarketer continues with "[b]y the way you will receive your $1,000 in coupon certificates long before the magazines begin, so you can start saving right away!" PX 10.[3]

28.    Once the consumer provides a credit card, debit card or auto checking information in order to pay for the first month's service, the telemarketer informs him / her that the consumer will be given "an additional ... $800 in coupon certificates ... . This now brings your total reward to $1,800." PX 86.

29.    The written materials also represent that the consumers will receive more

---

upon this disclosure.

[2] Again, the Defendants disclose that they provide certificates, not coupons.

[3] Disclosure regarding the provision of the coupon certificates as contrasted with the provision of actual coupons is again made in the "Closing Script."

money with the coupon book than it will cost them to order the magazines.

30.   The Defendants also make written representations regarding the value of the coupons.

31.   The Defendants mailed a "Welcome Package" to consumers that contained a "Mail Order Agreement" ("MOA"), a gift form, an envelope, a reader's guide detailing the magazines and a sample coupon book. PX 85.

32.   The MOA contained a pictorial flow chart explaining that customers are to fill in $1800 worth of certificates, mail those certificates to a redemption center, receive the chosen coupons and redeem the coupons for groceries and household items - representing that "$1800 in savings equals your favorite magazines plus more than $1000 extra to spend on your family." PX11, p. 60.[4]

33.   The coupon book the Defendants sent to consumers contained a "Certification Certificates." The top half of the page reads:

URGENT! URGENT! URGENT!
IMMEDIATE RESPONSE REQUIRED
You must activate the enclosed coupon book before you can begin redeeming your coupons and save the $1800.  Remember the coupons are good for over 1,200 nationally advertised grocery and other household products.  More importantly, it will pay for your magazine service with over $1,000 of extra money for you.

PX 85.

34.   The Certification Certificate itself says

"[t]his enclosed Coupon Book has a guaranteed redemption value of $1,800."

---

[4] The written materials also clearly disclose that the Defendants provide coupon certificates, not actual coupons.

PX 85.

35.    Consumers agreed to enroll in the Defendants' program because they wanted to receive the savings the coupons offered.  They did not enroll because of a desire to receive magazines.

36.    For instance, Laura Biel agreed to enroll in the program because she believed the representations that she would receive $1,000 in coupon savings for things like diapers and baby wipes.  Receipt of the magazines did not motivate her to enroll in the program.  Further, because she lived in a rural area and only specific brands were available in the baby care section, the Defendants' representations regarding the sample coupons were of particular importance to Biel. See Trial Transcript, Docket No. [219], p. 16-24.

37.    When Biel ultimately received the actual coupon booklet, the products listed on the samples - the ones Biel particularly wanted - were not included.  Biel was extremely disappointed.  When Biel voiced her complaints to the Defendants and sought to terminate the program because the coupons were not as represented, the Defendants declined, but did offer her different coupon program. Id., p. 26-29.

38.    Again, Biel was disappointed because the new coupon program did not list any products for baby items.  She never attempted to redeem the certificates. Id., p. 29-30.

39.    April Rogers also found the Defendants' representations about the value of the coupons to be enticing.  She found the program interesting because, as

a new mother, she was interested in obtaining coupons for diapers and formula. Like Biel, she was particular about the products she bought because her child was "fussy" about his formula. Id., p. 39-40.

40.    Rogers understood from the Defendants' representations that she would be able to redeem the coupons for particular brand name items. When she received the coupon vouchers, she realized that she could only redeem them for general categories of things - like "cleaners" or "baby items" rather than for the brand names as the Defendants had represented. Id., p. 40-44.

41.    Rogers also first learned after having enrolled in the program and paid her initial fee, that in order to redeem the coupons, she would have to pay a processing fee as well as the cost of stamps. Id., p. 44-45.

42.    Nonetheless, Rogers attempted to order coupons. She made two attempts with the first coupon company to no avail. Eventually she received a different voucher system from GrocerySavers.com. Again, a $2-$3 processing fee was required to redeem coupon vouchers. Rogers again attempted to redeem coupon vouchers but never received any. Id., p. 44-48.

43.    Rogers made several calls of complaint to the Defendants but never received any coupons. Id., p. 47-48.

44.    In addition to the witnesses who testified at trial concerning the Defendants' misrepresentations regarding the value of the coupons they would receive if they enrolled in the Read 'N Save program, the FTC introduced overwhelming documentary evidence indicating that the Defendants

misrepresented the value of the coupons to their consumers.

45.   Many consumers complained about the coupon program through the Pennsylvania Better Business Bureau ("BBB").  For instance, Tabitha Scoggins complained that the Defendants failed to disclose that to redeem the coupon vouchers, she would have to pay a service and a shipping fee. See PX49. Obviously, this undercut the "value" of the coupons.  She also complained that her attempts to redeem the coupon vouchers were fruitless.  She did not receive the coupons she requested and the coupons which were sent were of no use to her. Id.  The Defendants were aware of Scoggins' complaints.

46.   Jennifer Holderread also complained that, though she agreed to the Read 'N Save program because the Defendants represented that she would receive $1800 worth of coupons, she never received any coupons. See PX116, p. 57.

47.   Tina Estal similarly complained that she never received any coupon vouchers. Id, p. 74.

48.   Courtney Brorn did receive coupons, but was unable to use them because they "were no good." Id, p. 79.

49.   Anthony Stella informed the BBB that he and his wife did not recoup any money through the use of the coupons because the coupon process proved to be "too cumbersome" and not as represented by the Defendants. Id, p. 161-62.

50.   Amy Hatzer of Illinois complained to the BBB that, although the Defendants repeatedly attempted to collect for magazine subscriptions, she never

received any coupons or any coupon vouchers. Id., at 164-65.

51. After agreeing to the coupon program, Shannon Ireland of Houston, Texas similarly realized that the coupons were of little to no value. Id, p. 176-77. She found the coupons to be of no value to her and complained that they did not cover the cost of the magazines much less save her additional money. Id.

52. John Woodward of Danville, Illinois was similarly dissatisfied with the Defendants' representations regarding the value of the coupons. He found that the actual coupon vouchers did not correlate at all with the sample list of coupons the Defendants represented that they had. Woodward discovered that the coupons were not useful and had no value to him. Id, p. 191.

53. Tanya Miller voiced virtually the same complaints with the addition that she found it objectionable that she had to pay shipping costs for the coupons because the Defendants failed to disclose this fact in their telemarketing. Id., p. 194.

54. Amy Bray of Lawrenceville, Georgia also complained that she never received any coupons or coupon vouchers from the Defendants. Id, p. 200-201.

55. Tara Myers of Columbia, Pennsylvania actually sent in vouchers for the coupons, but the envelopes were returned without any coupons. Id., p. 203.

56. In short, Exhibit 116 is replete with examples of customers who did not receive the value of the coupons promised to them.

57. The Defendants were aware of these complaints both because the customers

complained directly to them and because the BBB made them aware of the complaints. See Trial Transcript, Docket No. [220], p. 44-45 and PX84, p. 32-45 (acknowledging that consumers called and voiced complaints about not receiving coupon vouchers; about having to pay processing fees; about receiving expired, unrequested or duplicate coupons, and about not receiving any coupons despite having sent in vouchers).

58.   The Defendants believed the complaints to be nothing more than people attempting to get out of their contracts. See Trial Transcript, Docket No. 220, p. 181.

59.   Though Rushnock theorized that the customers' failure to obtain coupons stemmed from such things as incorrect addresses or failure to apply proper postage or to otherwise follow directions, I find his explanations to lack credibility in light of the overwhelming number of complaints.

60.   The clear evidence of record indicates that customers did have valid complaints about not receiving coupons, about misrepresentations regarding the types of coupons actually available, and about even the availability of coupons.

61.   I find the Defendants' handling of the coupon provider portion of their program to be particularly egregious.

62.   The Defendants used Coupon Connection of America ("CCOA") as their coupon company beginning in 1992.  Though Martinelli testified that he had few problems or complaints with CCOA during the ensuing years, the State of

Pennsylvania filed a complaint against United Publishers in 1997 reciting a litany of complaints against the coupon program, focusing on the unexpected difficulties that consumers had in obtaining coupons if they were able to obtain any at all. See Trial Transcript, Docket No. 220, p. 126-130 and PX5.

63. At some point in time, CCOA apparently moved.  A change of address was taped on some of the CCOA books that the Defendants sent to their new customers.  See PX26, paragraph 8, PX31, paragraph 3.  Nevertheless, the Defendants did not go back to their then existing customers and provide them with a change in CCOA's address. See PX26, paragraph 7, PX40, paragraph 14.

64. In July of 2005, CCOA filed for Chapter 7 liquidation bankruptcy.  Shockingly, Martinelli did not learn of CCOA's bankruptcy, however, until the FTC informed him of the same during his deposition in January of 2008. See Trial Transcript, Docket No. 220, p. 74-75.

65. Thus, the Defendants continued to offer their consumers coupons after July of 2005 through a company that had gone bankrupt, despite the fact that the Defendants had received numerous complaints from customers about the coupon program. See PX 86, p. 72-73.

66. Indeed, the Defendants did not switch to another coupon company - Grocery Savers - until sometime in July of 2006 - nearly a year after CCOA filed for bankruptcy.  See PX86, p. 73-74.

13

67.     After the Defendants switched to Grocery Savers, they did not contact their existing customers who had CCOA coupon books and replace them with Grocery Savers books. See PX85, p. 130-134.

68.     Only those CCOA customers who called in to complain about not receiving coupons were switched from the CCOA program to the Grocery Savers program. Id. See also, PX84, p. 43-45.

69.     The Defendants are unable to identify a single consumer who received *any* coupons at all between July of 2005 and July of 2006.

70.     In fact, the Defendants have not identified a single customer who was able to redeem coupons in an amount sufficient to cover the cost of the magazine subscriptions during any period of time relevant to this litigation.

71.     Further, the record is replete with examples of consumers who failed to receive *any* value from the coupons much less the savings as represented by the Defendants.

72.     I find that the Defendants' customers did not receive valuable coupons or valuable coupon certificates as a result of participating in the Defendants' Read 'N Save program and that the Defendants misrepresented the value of the coupons the consumers would receive.

73.     All of the Defendants' revenues during the relevant period of time were generated as a consequence of the misrepresentations regarding the value of the coupons.

74.     The Corporate Defendants took $5,565,802.00 in gross revenue from

consumers between 2003 and 2007.  <u>See</u> Trial Transcript, Docket No. [221], p. 4-8.

75.    The Corporate Defendants refunded $24,458.00 which they took from consumers in contempt of this Court's preliminary injunction. <u>See</u> DX A.

76.    Accounting for the amount refunded, as referenced above, the Defendants received $5,541,344.00 from consumers during the relevant period of time.

77.    The Defendants' cost of goods during the same period of time was $759,333.00. <u>See</u> Trial Transcript, Docket No. [221], p. 4-8.

78.    Accordingly, the net amount the Corporate Defendants received from consumers as a result of making misrepresentations regarding the value of coupons consumers would receive is $4,782,011.00.

79.    The FTC is entitled to restitution in this amount.

*C. Cancellation Policy (Count VIII)*

80.    The FTC contends that the Defendants misrepresented their cancellation policy in a number of ways: (1) their "scripts" and written documents are ambiguous as to whether they are creating a contract or simply making an offer; (2) the terms of the cancellation policy are ambiguous; and (3) the Defendants fail to honor cancellations.

81.    I reject the FTC's contentions regarding the offer and acceptance and the ambiguous terms. These arguments go to whether a contract was formed or breached - not whether terms are misrepresented.

82.    The Defendants first reference the cancellation policy in the "Closing Script."

15

Consumers are told:

And as I stated earlier, if everything I have told you is not true, you do have the right to cancel 72 hours after you receive your written agreement.

PX10, p. 9.

83.    Contrary to the telemarketer's suggestion, there is no "earlier" reference to the cancellation policy.

84.    The MOA, however, provides that a consumer wishing to cancel must complete an enclosed form and return it within 3 or 7 days - depending upon the consumer's state of residence. See PX11.  The form recommends that consumers send the notice via certified mail. Id.

85.    The Defendants testified that the actual policy they followed was far more lenient than that set forth in their MOA.  According to the Defendants, they typically gave consumers 10 to 15 days to cancel, or until they placed an order for magazines. See PX 86, p. 96-97 and PX106, p. 11.

86.    The terms of the cancellation policy represented to the consumers and the cancellation policy actually used by the Defendants do differ.

87.    Accordingly, the Defendants do misrepresent the terms and nature of their cancellation policy.

88.    Yet to succeed on its claim, the FTC must demonstrate that the misrepresentations were "material."

89.    Between 2002 and the time of trial, 19,572 customers were sent the MOA. See PX158, paragraph 23.

90.    Of the 19,572 customers, 7,413 cancelled within the appropriate cancellation

period or before the magazine subscription was placed. Id.

91.  I find that the misrepresentation of the cancellation policy was such that it was not material.  The uncontradicted evidence of record demonstrates that more than a third of the customers who received the MOA during the relevant period of time were able to cancel their agreement.

92.  In light of these statistics I cannot find that the cancellation policy was materially misleading.

*D. The Legal Obligation to Pay (Counts II and VI)*

93.  This Court previously held that the Defendants sent form letters out on delinquent accounts to consumers and that such letters included language indicating that the consumers had "binding contracts" because they had the consumers' "electronic signatures." See Docket No. [163], p. 8.

94.  Based upon this Court's previous findings, the Defendants' representations in these regards were likely to mislead consumers in virtually every state. See Docket No. [163], p. 8-11 (explaining that various states have telephone solicitation statutes requiring that certain agreements be reduced to writing and signed by the buyer in order to be binding; explaining that the Defendants were bound by legal obligations set forth in consent judgments entered in North Carolina and West Virginia; explaining that every state except Michigan and Louisiana followed the Uniform Commercial Code's Statute of Frauds which provides that agreements which cannot be completed within one year and cost over $500 are unenforceable unless they

are signed by the party against whom enforcement is sought.).[5]

95.   The database also contained notations of "sent final form letter" in the "notes" column 3,108 times in 3,082 accounts. Id., p. 31.

96.   The phrase "sent final notice letter" appeared 1,652 times in 1,625 accounts. Id., p. 32.

97.   Finally, the phrase "sent gift recipient and employer letter (Howard Logan)" appeared 1,508 times in 1,507 accounts. Id.

98.   Each of these letters contained language explicitly or implicitly indicating that the consumer had a binding and enforceable legal contract. See PX 84, Ex. 3.

99.   Though Martinelli testified that the database was unreliable with respect to the number of letters sent out, I reject his testimony as lacking credibility.

100.   The Defendants made telephone calls of a similar nature.

101.   The Defendants' records show the code "TC" for "telephoned consumers" 23,043 times during the relevant period of time. See Trial Transcript, Docket No. [221], p. 33.  The database also shows a code for "called residence" 92,997 times. Id.

102.   Nevertheless, the FTC has not sustained its burden of demonstrating that the

---

[5] Although not entirely clear, the Defendants appear to have attempted to comply with the above-referenced statutes after litigation commenced by having consumers sign "Certification Certificates."  Yet I am unwilling to find that they satisfy the statutes.  First, the Defendants do not offer any Findings of Fact as to how many consumers signed the Certification Certificates nor any Conclusions of Law urging that the Certification Certificates somehow satisfy the statutes. Second, those tendered during trial do not appear to satisfy the state solicitation statutes in any regard. See Docket No. [227], n. 2.  Further, it is not clear what disclosure information or "terms and conditions" the Certification Certificates actually contained.

calls were made for the purpose of telling the consumers that they had a legal obligation to pay.

103.   I simply do not have sufficient evidence from which to draw this conclusion.

104.   Accordingly, I find that the FTC is entitled to restitution in the amount of $196,943.92 which was received by the Defendants as a result of the issuance of the letters referenced above. See Trial Transcript, Docket No. [221], p. 93-9

*E. Intention to Initiate Legal Action (Counts III and VI)*

105.   This Court previously held in its Opinion and Order with respect to the Motion for Summary Judgment that the Defendants misrepresented that they intended to initiate legal action against consumers when, in fact, they did not initiate and did not intend to do so. See Docket No. [163], p. 11-13.

106.   It appears that the Defendants sent at least 6,268 letters misrepresenting that some form of legal action would be taken. See Trial Transcript, Docket No. [220], p. 31-32.

107.   Again, as stated above, I reject Martinelli's contention that the information set forth in the database is unreliable.

108.   As stated above, the FTC is entitled to restitution in the amount of $196,943.92.  The Defendants acknowledge receipt of this amount of money following the issuance of letters threatening legal action. See Trial Transcript, Docket No. [221], p. 93-97.

*F. Failure to Disclose the Purpose of the Calls (Count IV)*

109.   This Court also previously held in its Opinion and Order with respect to the

Motion for Summary Judgment that the Defendants did not disclose that the purpose of the initial call was to sell goods and services. <u>See</u> Docket No. [163], p. 13-15.

110. The record indicates that the Defendants had to call approximately 1,000 consumers with the Qualification Script for every nine customers who enrolled in their Read 'N Save program. <u>See</u> PX 157, paragraph 147.

111. The Defendants had 10,253 accounts during the relevant period of time.

112. Accordingly, it is fair to presume that the Defendants made approximately 1,139,222 phone calls during which they failed to promptly disclose that the purpose of their call was to sell goods and / or services.

113. Nevertheless, I find that the FTC is not entitled to an award of any damages based upon this violation.

114. The FTC failed to proffer any evidence suggesting that any consumers failed to understand, before actually agreeing to participate in the program, that the Defendants were selling goods and / or services.

*G. Failure to Disclose the Total Cost of Goods and Services (Count V)*

115. This Court previously held in its Opinion and Order with respect to the Motion for Summary Judgment that the Defendants failed to disclose the total cost of goods and services before obtaining information and in so doing, violated the Telemarketing Sales Rule. <u>See</u> Docket No. [163], p. 15-17.

116. This failure occurred with respect to every consumer to whom the Defendants read the "Advertising Script" and the "Closing Script."

20

117.   Yet the FTC has not identified in a sufficiently specific manner the number of customers to whom these scripts were read.

118.   Moreover, I find persuasive the Defendants' contention that they ultimately disclose the total cost of goods sold.  Accordingly, awarding restitution for every customer to whom the scripts are read is not, in this Court's view, appropriate.

119.   Rather, restitution would be appropriate only with respect to those customers who in fact tendered payment information to the Defendants before total disclosure was made.  These customers actually did make payment while potentially confused by the Defendants' convoluted statements regarding the price of their program.

120.   The FTC has not, however, offered any evidence as to the amount of funds the Defendants received as a result of credit card or auto pay arrangements made at the inception of a customer's account.

121.   Moreover, the Defendants are already required to make restitution in the amount of all net revenue received during the relevant period of time.  This revenue would necessarily include amounts received as a result of credit card or auto pay arrangements made before the total cost of goods / services was disclosed.

122.   Consequently, I decline to find the FTC is entitled to an award of restitution.

*H. Barbara DeRiggi's Individual Liability*

123.   According to the FTC, DeRiggi directly participated in the deceptive conduct

at issue and knew or should have known of the Defendants' actions.

124.   I disagree.

125.   The Operating Agreement for Magazine Solutions indicates that Martinelli is the manager of the company.   Martinelli has been the only corporate manager of Magazine Solutions during its existence.

126.   DeRiggi has never been an owner or corporate manager of Magazine Solutions.

127.   DeRiggi has never been an owner, officer and / or director of United Publishers.

128.   DeRiggi has never received a distribution of profits from the Corporate Defendants.

129.   Magazine Solutions does not have a general manager.   There are three departments, each of which are separate and distinct - the credit department; the telemarketing department; and the clerical department.

130.   Each department's manager reports directly to Martinelli.   None of the managers have any authority over or report to any of the other managers.

131.   DeRiggi is the controller of the Corporate Defendants and the manager of the clerical department.

132.   Her job duties are primarily administrative in nature and consist generally of: completing payroll, paying bills, bookkeeping, typing, handling the mail, managing the clerical workers and placing orders with the magazine clearing house.

133.   DeRiggi did not have any authority to set or change company policy at the Corporate Defendants, including those policies at issue here.

134.   I find credible Martinelli's explanation that the organizational chart submitted in response to the CID on this matter which identified DeRiggi as having seniority over the other managers was erroneous.

135.   Rather, the chart was intended, albeit poorly drawn, to reflect that the managers of the clerical, telemarketing and customer service departments each reported directly to Martinelli.

136.   I similarly find credible Martinelli's and DeRiggi's statements that DeRiggi had no role in the drafting of the language used in the telemarketing scripts. Thus, she did not participate directly in any of the conduct relating to the coupons.

137.   Martinelli was entirely responsible for the language.

138.   To the extent that the responses set forth in the CID suggested that DeRiggi was involved in creating the scripts, I find credible the explanation that DeRiggi simply typed the scripts from what Martinelli had previously created in long hand.

139.   Nor did the FTC proffer any evidence indicating that DeRiggi participated directly in the misrepresentations regarding the alleged legal duty to pay and / or threatening legal action.  Unlike Rushnock, there is no indication that DeRiggi was privy to the letter from counsel suggesting that the Corporate Defendants lacked a binding contract with its consumers.

140. DeRiggi did have access to a bank account at Irwin Bank.  Yet I find credible the explanation that her name was on the account for Martinelli's convenience, so that she could execute his transactions in his absence.

141. DeRiggi never put any of her personal funds into that account nor did the Corporate Defendants lend her any money.

142. The FTC did not establish that DeRiggi knew or should have known that the Defendants were making misrepresentations.

CONCLUSIONS OF LAW

143. This Court has jurisdiction in cases brought under the FTC Act and the TSR. See 15 U.S.C. sections 45(a), 53(b) and 57b; 28 U.S.C. section 1331.

144. This Court also has subject matter jurisdiction because this is a civil action arising under an Act of Congress regulating commerce, 28 U.S.C. section 1337(a), and an agency of the United States is a plaintiff, 28 U.S.C. section 1345.

145. The Defendants' transactions are "in or affecting commerce" (FTC Act section 4) because they conducted a nationwide telemarketing program to offer and sell their product and because they receive payments from individuals throughout the United States.

146. Venue is proper because conduct arose in this District given that the Defendants are located in Monroeville, Pennsylvania. See 28 U.S.C. section 1391(b)-(c).

*A. The Defendants Violated Section 5 of the FTC Act*

147.   Section 5 of the FTC act declares unlawful - "unfair or deceptive acts or practices in or affecting commerce... ." 15 U.S.C. section 45(a).

148.   To establish that an act or practice is deceptive under Section 5, the FTC must demonstrate that "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances; and (3) the representation was material." See FTC v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003), citing FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir. 1988).

149.   The FTC has met its burden in establishing that, as set forth above and in the Opinion and Order addressing the Motion for Summary Judgment, the Defendants made representations: that the consumers would receive "valuable" coupons (Count I); that the consumers were legally obligated to pay for their services (Count II); and that the Defendants would initiate legal action if the consumers failed to pay (Count III).

150.   With respect to the second element, "[a]ctual deception of the consumers need not be proven; rather, the likelihood of deception or the capacity to deceive is the criterion by which the advertising is judged." FTC v. Think Achievement Corp., 144 F. Supp.2d 933, 1010 (N.D. Ind. 2000), rev'd in part on other grounds, 312 F.3d 259 (7th Cir. 2002).  See also FTC v. US Sales Corp., 785 F. Supp. 737, 748 (N.D. Ill. 1992) (stating that "[t]he FTC needs only to show that a reasonable consumer, upon hearing the advertisement, likely would be misled to his detriment ... advertisements are illegal if they have

25

a tendency or capacity to deceive.").

151.   The representation can be express or implied.  A defendant can be found

liable for "misleading consumers both by innuendo as well as by outright

false statements." In re Kraft, Inc., 114 F.T.C. 40, 121 (1991), aff'd, 970 F.2d

311 (7th Cir. 1992).

152.   The FTC has met its burden in establishing that, as set forth above and in

this Court's prior Opinion and Order, the representations regarding the

"valuable nature of the coupons;" the consumers' legal obligation to pay

for the Defendants' services; and the Defendants' intention to initiate legal

action, were likely to mislead consumers acting reasonably under the

circumstances.

153.   With respect to the third element, a representation must be material.  "[A]

material representation, omission, act or practice involves information

that is important to consumers and, hence, likely to affect their choice of,

or conduct regarding a product." Matter of Cliffdale Associates, Inc., 103

FTC 110 (1984).

154.   If consumers are likely to have chosen differently but for the deception,

then a misrepresentation is material. See FTC v. Southwest Sunsites, Inc.,

105 FTC 7, 149 (1985), aff'd, 785 F,2d 1431 (9th Cir.).

155.   The FTC has met its burden in establishing that, as set forth above and in

this Court's prior Opinion and Order, the representations regarding the

"valuable nature of the coupons;" the consumers' legal obligation to pay

for the Defendants' services; and the Defendants' intention to initiate legal action, were material in nature.

*B. The Defendants Violated the TSR*

156. As "sellers" or "telemarketers" engaged in "telemarketing," the Defendants are subject to the provisions of the TSR. 16 S.C.R. section 310.2(z), (bb) and (cc).

157. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. section 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. section 57a(d)(3), violations of the TSR constitute unfair or deceptive acts or practices in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. section 45(a).

158. Actions for violations of the TSR are subject to a three-year statute of limitations. 15 U.S.C. section 57b(d).

159. Because the FTC filed this action on May 23, 2007, the Defendants are only liable for any TSR violations commencing after May 23, 2004.

160. As set forth in this Court's prior Opinion and Order, it is an "abusive telemarketing act" for a telemarketer "to fail to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call," the seller's identity; that the purpose of the call is to sell goods or services; and the nature of the goods and services. See 16 C.F.R. section 310(d)((1)-(3)). See Docket No. [163], p. 13.

161. Again, as previously set forth in this Court's prior Opinion and Order, the FTC has met its burden in establishing that the Defendants violated this

provision when they failed to promptly disclose that they were selling magazines. (Count IV).

162.  As set forth in this Court's prior Opinion and Order, it is a deceptive telemarketing act or practice for a telemarketer to fail to disclose truthfully, in a clear and conspicuous manner, "the total costs to purchase, receive, or use, and the quantity of any goods or services that are the subject of the sales offer," before a customer pays. 16 C.F.R. section 310.39a)(1)(I).

163.  Disclosure must also occur "before requesting any credit card, bank account, or other information that a seller or telemarketer will or could use for payment." 68 F.R. 4580, 4599.

164.  As is also set forth in this Court's prior Opinion and Order, the FTC has met its burden in establishing that Defendants violated this provision when they requested credit card, debit card and / or auto-checking information while reading from the "Closing Script" before disclosing the total cost of the program. See Docket No. [163], p. 15-18.  (Count V).

165.  As set forth above, I found that the FTC did not establish that the Defendants' misrepresentation regarding the nature of their cancellation policy was material.

166.  Accordingly, the FTC has not met its burden in establishing that the Defendants misrepresented "[a]ny material aspect of the nature or terms of the seller's refund, cancellation, exchange or repurchase policies." See 16

C.F.R. section 310.3(a)(2)(iv). (Count VII).

167.   Individual defendants may be held personally liable for injunctive relief for
a business entity's Section 5 violations if they (1) participated directly in the
violative acts, or (2) had a role in directing, controlling, or formulating the
policies and practices of the company which resulted in the violative acts,
or (3) had the authority to control the actions of others that they knew or
should have known were taking place. See In re National Credit Mgmt
Group LLC, 21 F. Supp. 424, 461 (D. N.J. 1998); FTC v. Amy Travel Service, 875
F.2d 564, 573-74 (7th Cir. 1989); FTC v. Five-Star Auto Club Inc., 97 F. Supp.2d
502, 535 (S.D. N.Y. 2000).

168.   In addition, an individual may be held personally liable for corporate
violations where he or she "had actual knowledge of material
misrepresentations, was recklessly indifferent to the truth or falsity of a
misrepresentation, or had an awareness of a high probability of fraud
along with an intentional avoidance of the truth." Amy Travel, 875 F.2d at
573-74.

169.   As set forth in this Court's prior Opinion and Order, the FTC has already met
its burden in establishing that Martinelli is personally liable for all of the
corporate violations.

170.   Thus, Martinelli is jointly and severally liable, along with the corporations,
for the entire amount of restitution ordered.

171.   As set forth in this Court's prior Opinion and Order, the FTC has already met

its burden in establishing that James Rushnock is liable for the Corporate

Defendants' violations as set forth in Counts II (misrepresenting that

consumers have a legal obligation to pay), Count III (misrepresenting that

they will initiate legal action) and a portion of Count VI (misrepresentations

designed to induce payment).

172.   Rushnock is jointly and severally liable for restitution awarded under

Counts II, III and that portion of Count IV.

173.   As set forth above, the FTC failed to meet its burden of establishing that

Barbara DeRiggi is personally liable for any of the Corporate Defendants'

conduct.

*C. Relief*

174.   Courts have broad authority to enjoin unlawful acts that may be

anticipated from the Defendants' past conduct and to model injunctive

orders to fit the exigencies of a particular case. See FTC v. Kitco of Nevada,

612 F. Supp.2d 1282,1296 (D.C. Minn. 1985).

175.   The FTC has met its burden of establishing that permanent injunctive relief

is necessary here because there is a cognizable danger of recurrent

violations or some reasonable likelihood of future violations, at least with

respect to the Corporate Defendants and Martinelli.[6]

176.   The Defendants have been sued by numerous states for similar conduct in

the past, but declined to change their business practices.

---

[6]I do not find that such a danger exists with respect to Rushnock.

177. Their history of noncompliance with the law, with other court orders, and with this Court's prior Orders, supports a finding that violations will likely continue with injunctive relief.

178. Accordingly, the Corporate Defendants and Martinelli are hereby permanently enjoined from engaging in any further telemarketing programs involving the sale of magazines or the marketing of coupons.

179. The Corporate Defendants and Martinelli are also permanently enjoined from engaging in any further collection actions with respect to any current or former customers unless and until they have obtained the consumers' signed agreement.  The agreements shall comply with any and all applicable laws.

180. The Defendants are further required to remove all negative information that they placed or caused to be placed on their consumers' credit reports.

181. An award of $4,782,011.00 is hereby entered with respect to Count 1 for misrepresentations made regarding the value of the coupons consumers would receive if they participated in the Read 'N Save program.

182. Though the FTC did succeed on other claims, any further award would be duplicative.  The above-referenced figure represents *the total net revenue* the Defendants received during the relevant period of time.  All that revenue can be attributed to their misrepresentations regarding the value of the coupons.

183. Because that figure represents the net amount of all income received, it

would necessarily include any payments consumers made as a result of misrepresentations regarding the legal obligation to pay or threats of legal action.  It is also a more generous award than would be given for violations under the TSR regarding the coupons given the statute of limitations restrictions.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 7 -692 |
| | ) | |
| MAGAZINE SOLUTIONS, LLC, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

AMBROSE, Chief District Judge


**ORDER OF COURT**

AND NOW, this 15th day of March, 2010, for the reasons set forth in the accompanying Findings of Fact and Conclusions of Law, judgment is hereby entered in favor of the Plaintiff and against the Defendants as follows:

**Count I** - Judgment is entered in favor of the Plaintiff and against the Corporate Defendants and Martinelli.  Restitution is ordered in the amount of $4,782,011.00.

**Counts II and III** – Judgment is entered in favor of the Plaintiff and against the Corporate Defendants, Martinelli and Rushnock.  Restitution would be ordered in the amount of $196,943.92, except that this amount is already included in that set forth above with respect to Count I, so I find that additional recovery under Counts II and III is duplicative and unnecessary.

**Count IV** - Judgment is entered in favor of the Plaintiff and against the Corporate Defendants and Martinelli.  No award of restitution shall be made with respect to Count IV.

**Count V** - Judgment is entered in favor of the Plaintiff and against the Corporate Defendants and Martinelli.  No award of restitution shall be made with respect to Count V.

**Count VI** - Judgment is entered in favor of the Plaintiff and against the

33

Corporate Defendants and Martinelli with respect to all portions of Count VI and against Rushnock only with respect to those portions of Count VI dealing with statements made regarding the alleged binding nature of the contracts and threats to take legal action.  Though restitution would be appropriate under Count VI, because full restitution has already been awarded with respect to Count I, I find additional recovery under Count VI to be duplicative and unnecessary.

**Count VII** - Judgment is entered in favor of the Defendants and against the Plaintiff with respect to Count VII.

It is further ordered that the Corporate Defendants and Martinelli are hereby permanently enjoined from engaging in any further telemarketing programs involving the sale of magazines or the marketing of coupons.  The Corporate Defendants and Martinelli are also permanently enjoined from engaging in any further collection actions with respect to any current or former customers unless and until they have obtained the consumers' signed agreement.  The agreements shall comply with any and all applicable laws.  The Defendants are further required to remove all negative information that they placed or caused to be placed on their consumers' credit reports.

BY THE COURT:

/s/<u>Donetta W. Ambrose</u>
Donetta W. Ambrose,
U.S. District Judge